UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SOUTHERN-OWNERS INSURANCE
COMPANY,

    Plaintiff/Counterclaim Defendant,

v.                                                                Case No: 8:20-cv-00990-KKM-AEP

D.R. HORTON, INC., et al.,

    Defendant/Counterclaim Plaintiff.
_____

## ORDER

Plaintiff/Counterclaim Defendant Southern-Owners Insurance Company filed a motion to dismiss Count II of Defendant/Counterclaim Plaintiff D.R. Horton, Inc.'s Counterclaim, Doc. 40, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Upon consideration, this Court grants Southern-Owners Insurance Company's (Southern-Owners) motion to dismiss.

## I. Background[1]

This case centers around an insurance policy dispute. Southern-Owners issued a commercial general liability policy to General Punchout and Warranty, Inc. (General

---

[1] The facts are derived from the counterclaim, Doc. 32, the allegation of which the Court must accept as true in ruling on the instant motions to dismiss. *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 994 (11th Cir. 1983).

Punchout), an independent contractor that was subsequently hired by D.R. Horton, Inc. (D.R. Horton). Doc. 32 at 13. Per D.R. Horton and General Punchout's contractor agreement, D.R. Horton was added as an "Additional Insured" under General Punchout's insurance policy. *Id.* This policy among other things imposed on Southern-Owners a duty to defend D.R. Horton against third-party claims. *Id.* at 14.

The underlying incident occurred when a General Punchout employee was sent to a D.R. Horton home owned by the Lhotkas. While there, the employee exposed and touched his penis to the forearm of Lhotkas' minor child. Doc. 36 at 5. The employee was ultimately convicted for this crime. *Id.* at 5–6. Following this incident, the Lhotkas brought claims against both General Punchout and D.R. Horton. D.R. Horton alleges—as counterclaims—that Southern-Owners refused to defend and, if needed, indemnify D.R. Horton, though Southern-Owners defended General Punchout from the Lhotkas' claims. Doc. 32 at 15. Per the counterclaims, Southern-Owners also refused to disclose certain information about the insurance as required by Florida state law. *Id.* at 14.

The specific facts relevant to the instant motion to dismiss are as follows: After all the parties met to mediate the potential claims in September 2020, Southern-Owners informed D.R. Horton that they had offered the insurance policy limit of $1 million to secure the release solely of General Punchout, and therefore no longer had a duty to continue any defense against the Lhotkas' claims because it had exhausted the insurance policy limits. *Id.* at 15. When the Lhotkas brought additional claims against D.R.

Horton, D.R. Horton again demanded that Southern-Owners defend against the claim. *Id.* at 16. Southern-Owners agreed to for the time being, while maintaining it was under no obligation to do so. *Id.* at 16. Southern-Owners then filed the instant suit, seeking a declaration that it was not obligated to defend D.R. Horton. Doc. 1. D.R. Horton filed two counterclaims against Southern-Owners, one for a breach of contract and another for breach of the common law duty of good faith. Doc. 32 at 17. Southern-Owners filed this motion to dismiss the second claim on the basis that any bad faith claim is premature. Doc. 40 at 1.

## II. Analysis

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering the motion, the court accepts all factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

The central question before the Court is when an insured may bring a bad-faith claim for failure to settle under an insurance contract. Under Florida law, the general rule is that a bad faith claim accrues only *after* the insurance policy's coverage and liability are determined. *See Blanchard v. State Farm Mut. Auto. Ins. Co.*, 575 So. 2d 1289, 1291 (Fla. 1991) ("[A]n insured's underlying first-party action for insurance benefits against the insurer necessarily must be resolved favorably to the insured before the cause of action for bad faith in settlement negotiations can accrue."); *Hartford Ins. Co. v. Mainstream Const. Grp, Inc.*, 864 So. 2d 1270, 1272 (Fla. 4th DCA 2004).

There are two narrow exceptions to this general rule. Florida courts have allowed bad faith claims to proceed when the merits of the claim do not turn on the antecedent question of coverage and liability. *See Cunningham v. Standard Guar. Ins. Co.*, 630 So. 2d 179, 182 (Fla. 1994); *Allstate Indem. Co. v. Oser*, 893 So. 2d 675, 676–77 (Fla. 1st DCA 2005). The issue here turns on whether the facts as alleged in the counterclaims permit a bad-faith claim to proceed before the questions of coverage and liability are resolved. Because neither exception applies, the Court agrees with Southern-Owners that D.R. Horton's bad-faith claim may not proceed at this time.

Southern-Owners' motion to dismiss asserts the straight-forward argument that a bad-faith claim can only accrue *after* the insurance policy's coverage and liability are determined. Doc. 40 at 2. Southern-Owners argues that because coverage and liability claims remain pending, the issue of good faith is not ready for adjudication. *Id.* at 3. In

4

support of this claim, Southern-Owners offers numerous cases affirming the general rule. *Id.* at 2–3.

D.R. Horton agrees that as a *general* matter, a claim for bad faith accrues only after determining that coverage is owed under the policy, but it asserts that the unique facts underlying this bad-faith claim warrant an exception. Doc. 43 at 5. Unlike a typical bad-faith claim—seen in many of the cases Southern-Owners cited for support—it argues that the claim here does not depend on the *future* resolution of the policy coverage. Rather, this bad-faith claim turns on the *past* decision of Southern-Owners not to secure a release for D.R. Horton while negotiating with the Lhotkas. *Id.* at 6–7. And in instances like this, it contends, the Court can address bad-faith claims before resolving all of the other underlying claims.

D.R. Horton cites two cases—*Cunningham v. Standard Guar. Ins. Co.*, 630 So. 2d 179 (Fla. 1994) and *Allstate Indem. Co. v. Oser*, 893 So. 2d 675 (Fla. 1st DCA 2005)—to show that Florida courts will diverge from the general rule and adjudicate a bad-faith claim before resolving the underlying issues. Doc. 43 at 5. These two cases involved unique fact patterns though that warranted diverging from the general rule—facts not alleged in the counterclaims. In the absence of further examples of Florida courts extending these exceptions, this Court will apply the general rule and dismiss D.R. Horton's claim as premature.

First, *Cunningham* is unlike the instant case because *Cunningham* included a stipulation among the parties to make the settlement contingent upon a finding of bad

5

faith. In that case, Joseph James and Mr. and Mrs. Cunningham were in a car collision, causing injuries. 630 So. 2d at 180. James was insured by Standard Guaranty Insurance Company for injury and property damages. *Id.* After failing to reach a settlement for several months, the Cunninghams added Standard Guaranty as a party to the suit, alleging Standard Guaranty had acted in bad faith for failing to settle the claim. *Id.* Crucially, Standard Guaranty and the Cunninghams reached an agreement to litigate the bad-faith claim before litigating the underlying negligence claim. *Id.* If no bad faith was found, the Cunninghams would settle for the policy limits, and James would not face the risk of being liable for any excess judgment. *Id.* The Court held that the stipulation alleviated any jurisdictional concerns and should be encouraged to conserve judicial resources by simplifying and shortening the litigation needed to resolve the claim. *Id.* at 181–82.

None of those factors are present here. This motion to dismiss demonstrates that the parties have not agreed to resolve the bad-faith claim first, and the Lhotkas have not agreed to any settlement cap that turns on the bad-faith claim. Therefore, the *Cunningham* exception is not applicable.

Second, *Oser* is distinguishable because the relevant questions of coverage and liability had already been determined *before* the bad-faith claim was raised. There, Sabrina Patterson's brother crashed her car into Timothy Oser's vehicle. 893 So. 2d at 676. Sabrina Patterson was insured by Allstate, which included $25,000 worth of coverage for property damage. Patterson thought (and alleged) that her insurance also included

6

$25,000 bodily injury liability (BIL), but Allstate denied that Patterson had BIL insurance. *Id.* Allstate refused two settlement offers from Oser, including an offer to settle the entire case for the $25,000 property-damage limit. *Id.* Oser then sued Patterson directly, and while this litigation was ongoing, Allstate settled with Oser by paying the $25,000 property-damage limit to settle *only* the property damage claim. *Id.* The BIL claim against Patterson proceeded to trial, resulting in a judgment of about $1.5 million against her. *Id.* After the verdict, Patterson and Oser together sued Allstate, alleging among other things that Allstate acted in bad faith by not settling with Oser when it had the chance to do so within Patterson's coverage limits. *Id.*

Under the above facts, the Florida court allowed the bad-faith claim to proceed. *Id.* That court diverged from the general rule because the coverage and liability questions had already been resolved before the bad faith claim was brought. *Id.* at 677. Patterson was liable, the property-damage coverage was never in question, and it was determined that Patterson did not have BIL coverage. *Id.* The bad-faith claim thus did not turn on the contested nature of the BIL coverage, but rather "depend[ed] upon a mixed question of law and fact whether, even without BIL coverage, Allstate owed Patterson a duty to settle Oser's claims against her for both BIL and property damage because it either expressly undertook such duty or because the circumstances created a duty." *Id.* D.R. Horton claims the same is true here. Doc. 43 at 6. D.R. Horton argues the bad-faith claim does not turn on any of the unresolved coverage or liability

7

questions, but rather on Southern-Owners' failure to properly represent them when negotiating with the Lhotkas. Doc. 43 at 6.

But unlike in *Oser*, the remaining questions of coverage and liability *are* relevant to D.R. Horton's claim. Patterson and Oser's bad-faith claim against Allstate was to recover "the amount of the unsatisfied judgment against Patterson," an established amount of $1,502,584.60. *Id.* at 676–77. The parties, and the Court, have no such clarity in this situation. At this time, D.R. Horton owes nothing to the Lhotkas. And depending on how any number of issues and claims are resolved, that could change dramatically, or not all. The exact shape of the bad-faith claim, including what judgement and relief may be proper, will only be clear after these issues are resolved. These uncertainties explain the rationale behind the general rule, which requires that a "third party must obtain a judgment against the insured in excess of the policy limits before prosecuting a bad-faith claim against the insured's liability carrier." *Cunningham*, 630 So. 2d at 181.

Additionally, D.R. Horton tries to distinguish this case from the general rule as established in *Blanchard* and its progeny by emphasizing this distinction between first- and third-party claims. It is true that most cases upholding the general rule arise in the first-party claim posture while this case is a third-party claim. But that fact alone is not dispositive, and the same rule has been applied to third-party claims. *See GEICO Gen. Ins. Co. v. Harvey*, 109 So. 3d 236, 239 (Fla. 4th DCA 2013) ("A cause of action for an insurer's bad faith failure to settle a third party claim may not be maintained until a

8

judgment in excess of the policy limits has been entered against the insured."); *see also Cunningham*, 630 So. 2d at 181.

Defendant/Counterclaim Plaintiff's bad-faith claim has not accrued and therefore is not ripe for adjudication. Accordingly, Plaintiff/Counterclaim Defendant's motion to dismiss Count II for failure to state a claim upon which relief can be granted is **GRANTED**. Count II of the Amended Complaint is **DISMISSED without prejudice**.

**ORDERED** in Tampa, Florida, on April 16, 2021.

*[signature]*
Kathryn Kimball Mizelle
United States District Judge

9